Wilson v. Colborn.

---

No. 22,390.

AMANDA JANE WILSON, *Appellee*, v. EDWARD F. COLBORN et al.,
*Appellants*.

SYLLABUS BY THE COURT.

1. WILL—*Action to Set Aside—Mental Incapacity and Undue Influence —Evidence—Findings.* The findings of fact examined, and found to be supported by the evidence.

2. SAME. The conclusions of law examined, and found to be supported by the evidence and findings of fact.

3. SAME. It was not error to refuse the findings submitted by the defendants.

4. SAME. As the trial was by the court without a jury, it will be assumed that if any incompetent evidence was received the competent was sifted therefrom and alone regarded.

5. SAME—*Evidence—Transaction with Person Since Deceased.* One of the defendants was the brother of the plaintiff and also a trustee under the will. His cotrustee was a party and executor of the estate of the deceased. It was sought to prove by them that they had had certain conversations with the testatrix as to how she desired her property to go at her death. *Held,* that the court properly refused to receive this testimony.

Appeal from Ellis district court; ISAAC T. PURCELL, judge. Opinion filed March 6, 1920. Affirmed.

*E. A. Rea,* of Hays City, *Joseph G. Waters,* and *John C. Waters,* both of Topeka, for the appellants.

*A. D. Gilkeson,* of Hays City, *Lee Monroe, C. M. Monroe, Guy L. Hursh,* and *E. R. Sloan,* all of Topeka, for the appellee.

The opinion of the court was delivered by

WEST, J.: This action was brought by the plaintiff, a daughter, against Ewdard F. Colborn, her brother, and his two children, Chester and Dorothy, as heirs, and Edward F. Colborn and H. D. Shaffer, as trustees under the will, the latter being executor thereunder, to set aside the will of her mother and its probate on the ground that the instrument was void when signed by the testatrix, by reason of her advanced age, condition of health and inability fully to understand its nature; that she was—

"Particularly subject to the will, wishes, advice, suggestion, influence, persuasion, domination, direction and control of defendants, particularly defendant Edward F. Colborn, to command and induce her to execute said will; that she was incapable of exercising an independent will and judgment, unaffected by the influence of said Colborn, and was by him persuaded and induced to make said will."

Also, that he was her son and occupied a place of trust and had her entire confidence and acted as her legal adviser; that the will was dictated by him, signed by her without being read by her, and by him drawn and brought to her residence. Plaintiff prayed that it be set aside; that Shaffer, executor, be required to account for all properties held by him as executor; and that Colborn and Shaffer, as trustees, be enjoined from taking charge of or distributing the proceeds of the estate.

The testimony of some sixteen witnesses was taken, and the court found that at the date of the execution of the instrument the testatrix was not of sound mind and memory, did not have full knowledge of acts she was engaged in or the property she possessed, or an intelligent understanding of the disposition she desired to make of her property or whom she desired to receive it, and did not comprehend the claims of those entitled to her bounty or excluded from it; that the

instrument was not her will; that she did not understand its contents or nature; that her signature thereto was procured by the undue influence of Edward F. Colborn, occupying at the time a position of trust and confidence, and that it expressed his wishes and not hers; that the will was dictated by Edward F. Colborn and signed at his instance and contained the terms. dictated by him; and that the evidence failed sufficiently to show that the testatrix had any independent advice or counsel with reference thereto.

The court concluded as a matter of law that the instrument was void, and, together with the probate thereof, should be set aside and the plaintiff have the relief prayed for.

The defendants appeal, and contend that the findings of fact are against the evidence; that the conclusions of law are contrary to the evidence and the law; and that the court erred in refusing to adopt findings submitted by them, in receiving and rejecting testimony, and in overruling the motion for a new trial.

It is argued that the will responded to every call of motherly affection and left no natural object of her bounty uncared for. An assortment of subcuticular adjectives is used as to the motives of the plaintiff and her husband. It is asserted that the plaintiff qualified as executrix and served under the will for about seven months, then resigned and brought this suit; that the testimony introduced by her was mostly by servant girls and nurses who were evidently under the tutelage of the plaintiff, and a few others, who based their testimony upon loss of memory and repetition in the talk of the deceased, a physician of the deceased basing his opinion of her insanity upon the fact that at times she did not know her family; that there was no real evidence offered to show undue influence on the part of Edward F. Colborn; that the letters of the testatrix were—

"Mountain ranges of sanity, full of mother love and void of malice or ill will to any one, written connectedly, sweetly and as intelligently as an elderly woman could."

That the plaintiff—

"Has rancor, anger, malevolence and vituperation against every person whom she imagined stood between her and the property she and her husband went out there to get, and such feelings reach their climax in

her degenerate remarks about her step-father, who willed her the homestead, the finest in Ellis county, and whose will, she declared on the stand, was her only muniment of title."

The testimony of Major Jack Downing and wife is contrasted with that of—

"Servants, nurses and kitchen help, who swore to things in the extreme degree, capsheaved by the appellee, who swore that her mother had been crazy for twenty years."

Counsel, therefore, in their brief say:

"We think the whole decision was wrong."

The plaintiff's counsel in their brief call attention to the fact that at the time the will was made Edward F. Colborn secured the absence of all other parties he thought might be at all interested and got a clear field for his operations; that he had occupied a position of confidence and trust with his mother, being an admitted attorney, and had acted throughout a number of years as her legal adviser; also, that the witnesses to mental incapacity were those who had the best opportunity to observe the testatrix, including some of her old friends whom she had known for years.

The will was signed in March or May, 1912. The young woman who worked in the home of the testatrix that year thought she was insane before she hurt her hip, and after this injury she noticed this change, and the testatrix did not know who the witness was; that the deceased would tell Mr. Colborn about everything and about private business affairs.

Dr. Hass began to treat her in March, 1912, and treated her until she died, which was in August, 1916. He thought she was insane because at times she did not know her immediate family, and thought she was traveling when she was at home.

"I had called so often and there were lots of times she would ask me who I was and ask the nurse to introduce her."

He also testified that her mental condition gradually became worse; that she could easily be influenced; that he told her son Edward that he thought his mother was in a bad shape mentally; and that she did not know when her husband died.

G. M. Cox, a merchant in Hays, testified that he had frequent conversations with Mrs. Treat from 1910 until her death—

"When I was talking with her she was under the hallucination she was in Denver; that was just before the accident; I could not persuade

her she was not in Denver; nearly always after that she was under the hallucination she was in Denver; she said she would like to see her fish pond in Hays; she knew me and my wife well; and she would ask if I was married; she insisted my wife was the wife of a clergyman."

Dr. Snyder was appointed by the court in 1916 to make an examination of the testatrix's sanity, and deemed her mentally irresponsible, and that she had been so for as many as four or five years.

Judge Gilkeson testified that Mr. Holmquist said that Mr. Treat wanted to sign a deed and wanted the witness to come down there, and he went with Mr. Madden, and when they got there Mr. and Mrs. Treat were present and he asked Treat what he wanted and he said:

"I want my wife to sign the deed and they don't want her to. . . . I asked him who, and he said 'Jane.' Just then Mrs. Wilson came on the scene and read the riot act to me for having her insane mother sign a deed, and abused me pretty thoroughly for fifteen or twenty minutes, and called in a nurse there . . . and she said, 'You know that she is insane, don't you?' The nurse said, 'Yes.' . . . I said to Mrs. Treat, 'Do you wish to sign this deed?' She turned around and looked at her husband and said, 'Do you want me to?' and he said, 'Yes.' . . . As I handed it to Mr. Madden, Mrs. Treat made the remark, 'Am I a Treat?' "

This seems to have been in September, 1912.

As is usual in such cases, there was considerable evidence to support the assertion of the testatrix's sanity and testamentary capacity, but the trial court, having heard all the witnesses who testified orally and having considered the depositions, was convinced and found that the alleged mental incapacity and undue influence were established, and these conclusions were supported to such an extent that we cannot overturn the decision.

The complaints touching the admission of testimony may be answered by suggesting that the trial was by the court and it will be assumed that the competent testimony was sifted from the incompetent and the latter disregarded.

Error is assigned on the refusal to receive the testimony of conversations had by Colborn and Shaffer with the testatrix touching her desire as to how her property should go at her death. Originally, section 320 of the code was as follows:

"No party shall be allowed to testify in his own behalf in respect to any transaction or communication had personally by such party with a

Wilson v. Colborn.

deceased person, when the adverse party is the executor, administrator, . . . where they have acquired title to the cause of the action immediately from such deceased person. . . ." (Gen. Stat. 1909, § 5914.)

In *Williams v. Campbell*, 84 Kan. 46, 113 Pac. 800, it was held that a plaintiff suing to recover real estate claimed by her by virtue of being the wife of the decedent—defendants being grandchildren and great-grandchildren of such decedent, and having acquired their interest through his daughter—was not prohibited from testifying to communications and transactions had personally by such plaintiff with the decedent—

"As the parties adverse to her did not acquire their title to the cause of action *immediately* from the decedent." (Syl.)

This decision brought about the change in this section, which now reads—

"No *person* shall be allowed to testify in his own behalf in respect to any transaction or communication had personally by such *party* with a deceased person, where either party to the action claims to have acquired title, directly or indirectly from such deceased person, or when the adverse party is the executor, administrator, heir at law, next of kin, . . . of such deceased person. . . ." (Gen. Stat. 1915, § 7222.)

Edward F. Colburn and H. D. Shaffer are both persons. Each was a party to the cause, and by each were sought to be proved conversations had with the testatrix whose lips were closed by death. The party adverse to both these persons and parties claimed to have acquired title directly from the deceased. No error was committed in excluding this evidence.

The findings of fact submitted by the defendants were simply the reverse of those made by the court and must go with the rest of the case as a part of the misfortunes of legal war.

Contests in which wills are sought to be avoided because of mental incapacity and undue influence, when between blood relatives, often end in accentuated disappointment to the losing side. The very ties that would naturally bind the litigants in harmony seem by some strange trait of human nature to become charged with the electricity of passion and spite. Regrettable as this is, the courts cannot help it, and in this case, as in many others of like kind, it is found and determined that the facts shown support the findings, and justify the conclusion reached by the court below, which conclusion must be upheld.

The decree is affirmed.